**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 28, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS,

    Plaintiff - Appellant,

v.

NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, PA; ACE PROPERTY
AND CASUALTY INSURANCE
COMPANY,

    Defendants - Appellees.

No. 25-4049

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:21-CV-00582-TC)**
_____

Haley K. Krug of Kirton McConkie, Boise, Idaho (Randy T. Austin, Wade L.
Woodard, Justin W. Starr, and Michael D. Johnston of Kirton McConkie, Salt
Lake City, Utah, with her on the briefs), for Plaintiff-Appellant.

Mark J. Sobczak of Nicolaides Fink Thorpe Michaelides Sullivan LLP,
Chicago, Illinois (Phillip S. Ferguson and Rebecca Lee Hill of Christensen &
Jensen, P.C., Salt Lake City, Utah, and Richard H. Nicolaides Jr. and Amy P.
Klie of Nicolaides Fink Thorpe Michaelides Sullivan LLP, Chicago, Illinois,
with him on the brief), for Defendant-Appellee National Union Fire Insurance
Company of Pittsburgh, PA.

Christopher A. Wadley (Ryan J. Rodman with him on the brief), of Walker
Wilcox Matousek LLP, Chicago, Illinois, for Defendant-Appellee ACE
Property and Casualty Insurance Company.

_____

Before **PHILLIPS** and **MORITZ**, Circuit Judges, and **GARCIA,** District Judge.[*]

_____

**PHILLIPS**, Circuit Judge.

_____

From 2007 to 2011, Michael Jensen sexually abused children in Martinsburg, West Virginia. Jensen's parents and grandfather were prominent members of the Church of Jesus Christ of Latter-Day Saints. Some of Jensen's victims sued the church in West Virginia state court for failing to take precautions that might have stopped his abuse. At trial, but before verdict, the church settled with the remaining minor plaintiffs and their families.

The church then turned to two of its insurers—National Union and ACE—to pay its defense and settlement costs. Both refused. So the church sued them in federal district court in Utah, and the court granted summary judgment to the insurers.

The church now appeals, arguing that the court should have read two ambiguous policy provisions in favor of coverage. The insurers argue that those provisions unambiguously preclude coverage.

We agree with the church. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the district court's grant of summary judgment and remand for further proceedings.

_____

[*] The Honorable Matthew L. Garcia, United States District Judge for the District of New Mexico, sitting by designation.

## BACKGROUND

### I.    Several children and their families sue the LDS Church over Michael Jensen's sexual abuse.

In Provo, Utah, in 2004, 13-year-old Michael Jensen groped two 13-year-old classmates on separate occasions. He was charged with two felonies, but he pleaded guilty to two misdemeanors.

Some of Jensen's later victims believed that the Church of Jesus Christ of Latter-Day Saints "put its thumb on the scale" to obtain that plea deal. App. vol. 4, at 943 (citation omitted). Jensen's grandfather was a high-ranking official in the LDS church, and a prominent LDS official attended Jensen's juvenile adjudication. One of Jensen's friends later testified that Jensen had said his grandfather "helped him get out of the trouble." *Id.* (citation omitted).

Months later, Jensen and his parents and siblings moved to Martinsburg, West Virginia. There, Jensen's parents assumed prominent volunteer positions in the local LDS church. His father became part of the Stake High Council, a group that advises local church officials and assists with communications and discipline. And his mother became the president of the Relief Society, the church's women's organization.

As Relief Society President, Jensen's mother offered Jensen as a babysitter to other church families. While babysitting and during other stays with church families between 2007 and 2011, Jensen sexually abused several children. He was convicted of sexual assault and sexual abuse in 2013.

Later, some of Jensen's victims sued his parents, church officials, and the church itself in West Virginia state court. At trial, after years of litigation, the church settled with the remaining plaintiffs.

It's not crucial to this appeal, but because the West Virginia case settled before verdict, the district court and parties here dispute the church's role in Jensen's abuse.

Relying on Jensen's victims' amended complaint from the West Virginia lawsuit, the district court here described the church's negligence as "failing to" report suspected abuse, protect victims, supervise or train employees, and warn families of Jensen's prior conduct. *Church of Jesus Christ of Latter-day Saints v. Nat'l Union Fire Ins. of Pittsburgh*, 817 F. Supp. 3d 1212, 1217–18 (D. Utah 2025) [hereinafter *LDS*]. The court also wrote that the church held out Jensen as a babysitter for church families and coordinated Jensen's "living arrangements with Church families with minor children." *Id.* It ruled that the church's "negligence evolved over time," becoming "more egregious" as reports of Jensen's abuse "increased in frequency." *Id.* at 1223.

The church disagrees with this view. Faulting the district court's reliance on the West Virginia case's amended complaint, the church asserts that "no evidence in the record" before the district court showed that church officials received most of the warnings alleged in the amended complaint. Op. Br. at 6.

But National Union defends the district court's reliance on the complaint, and it says that the record supported the court's view. For example, National

4

Union points out that West Virginia's supreme court reversed the trial court's decisions that had (1) excluded evidence suggesting church officials knew of Jensen's abuse and (2) granted summary judgment to the church defendants on the victims' conspiracy claim. *See Jane Doe-1 v. Corp. of President of The Church of Jesus Christ of Latter-day Saints*, 801 S.E.2d 443, 464–69, 474 (W. Va. 2017). And record evidence from depositions, trial transcripts, and a report from the church's trial lawyers suggest that church officials should have known about the risk Jensen posed.

It's enough to say that the church was potentially liable for failing to take reasonable precautions between 2007 and 2011 that could have prevented Jensen's sexual abuse of the settling victims.

## II. The church sues its insurers in federal court to recover the West Virginia lawsuit's costs.

During trial, the church turned to National Union and ACE, two of its insurers between 2007 and 2011. The church told them that it expected them to pay for settlement and defense costs. The insurers refused.

So after the church settled with the victims, it sued the insurers in federal court in Utah for breach of contract and breach of the implied covenant of good faith. The church sought damages and a declaratory judgment that the insurers needed to pay the church's defense costs and indemnify it for the settlements. The insurers raised—and continue to raise—several counterarguments for why they don't need to pay.

The district court granted summary judgment to the insurers by ruling on only one issue, *LDS*, 817 F. Supp. 3d at 1236, 1241, and the church appeals only that ruling. That issue is the insurance policies' use of the word "occurrence." The policies pay out per "occurrence" leading to bodily injury, but only when the church's liability for that "occurrence" exceeds the "retained limit" of what the church must pay first. For example, if the retained limit is $100, and the church's liability for an occurrence is $99, the retained limit isn't met, and the insurer need not pay.[1] But if the church's liability for that occurrence were $101, the insurer would pay the $1 above the retained limit.

In the West Virginia litigation, no single settlement between the church and one of Jensen's victims met the policies' retained limits. When added together though, the settlements exceed those limits, meaning the insurers would need to cover the excess amount, absent some other reason to deny coverage.

That's why, at the district court, the church argued that its negligence was one occurrence, while the insurers argued that it was several. If the

---

[1] To respect the protective order between the church and the victims, we don't use the actual retained limit or settlement amounts. And we grant the parties' motions to seal unredacted briefs and volumes of the appendix. Parties must show "a real and substantial interest that justifies depriving the public of access to the records that inform our decision-making process." *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1047 (10th Cir. 2017) (citation omitted). The parties have shown such an interest here: protecting the identities of sex-abuse victims and the settlement terms between those victims and the church.

church's alleged negligence counts as just one occurrence, the insurers might need to pay part of the church's defense and settlement costs. But if it counts as several occurrences, the insurers pay nothing.

The district court rejected the church's interpretation, ruling that the policies' definitions of "occurrence" unambiguously meant that "the abuse of separate victims at separate times and in separate places presumptively constitutes multiple occurrences." *LDS*, 817 F. Supp. 3d at 1224, 1234–35. It held that "a separate occurrence arose every time Mr. Jensen abused separate children at separate times and in separate places." *Id.* at 1223. So the district court granted summary judgment to the insurers, and the church timely appealed.

## DISCUSSION

We review de novo a district court's grant of summary judgment, applying the same legal standard as the district court. *N.H. Ins. v. TSG Ski & Golf, LLC*, 128 F.4th 1337, 1344 (10th Cir. 2025). That standard is to grant summary judgment only if "there is no genuine dispute as to any material fact," and the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

And because this case is in federal court through diversity jurisdiction, we apply the forum state's substantive law. *See N.H. Ins.*, 128 F.4th at 1344. The parties agree that Utah law applies. "When the federal courts are called upon to interpret state law, the federal court must look to rulings of the highest

7

state court, and, if no such rulings exist, must endeavor to predict how that high court would rule." *Dyno Nobel v. Steadfast Ins. Co.*, 85 F.4th 1018, 1025 (10th Cir. 2023) (citation omitted).

The district court erred in granting summary judgment to the insurers. The policies' definitions of "occurrence" are ambiguous, the church's reading is plausible, and Utah law requires courts to read ambiguous provisions in favor of coverage.

We first explain why the district court should have interpreted the policies in favor of coverage. We then address the insurers' arguments that we should affirm the court on alternative grounds.

## I.    Utah courts read ambiguous provisions in favor of coverage.

Under Utah law, insurance policies are contracts that we construe using "the text of the contract itself." *See Compton v. Hou. Cas. Co.*, 393 P.3d 305, 310 (Utah 2017) (citation omitted).

But when the text isn't clear, "any ambiguity or uncertainty in the language of an insurance policy must be resolved in favor of coverage." *Lopez v. United Auto. Ins.*, 274 P.3d 897, 902 (Utah 2012) (citation omitted). This is because "insurance policies are adhesion contracts," "typically drafted by insurance company attorneys," "not negotiated by the insured," and "offered on a take-it-or-leave-it basis." *Farmers Ins. Exch. v. Versaw*, 99 P.3d 796, 800 (Utah 2004). Whether a policy provision is ambiguous "is a question of law,"

*Mellor v. Wasatch Crest Mut. Ins.*, 201 P.3d 1004, 1008 (Utah 2009) (citation

modified), which we review de novo.

We turn now to the text of the insurance policies. Each policy here pays

out when the church's liability for a bodily injury exceeds the policy's retained

limit. The retained limits apply to each occurrence leading to bodily injury.

National Union's policy defines "occurrence" like this:

> [A]n accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one Occurrence.

App. vol. 1, at 92. And ACE's policies define it like this:

> [A]n accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions shall be considered as arising out of the same 'occurrence', regardless of the frequency or repetition thereof, or the number of claimants.

*E.g.*, *id.* at 277.[2]

The district court held that the policies' definitions of "occurrence" are

"not ambiguous—at least not where there were multiple victims abused at

separate times, and especially where the insured received warnings about the

abuse." *LDS*, 817 F. Supp. 3d at 1234. It then cited *Lee v. Interstate Fire &*

*Casualty Co.*, 86 F.3d 101, 104 (7th Cir. 1996), to hold that even if

"occurrence" were ambiguous, "it is unclear what it means to interpret this

---

[2] ACE's policies with the church changed over the relevant years. ACE hasn't argued on appeal that the changed language affects our analysis.

language in favor of the insured . . . because the phrase . . . affects the amount of coverage under the policies in multiple ways." *LDS*, 817 F. Supp. 3d at 1235.

On appeal, the church argues that it presented the district court with a reasonable interpretation of the policies that would have resulted in coverage: the church's failure to prevent Jensen's several instances of abuse counted as one occurrence. So under Utah law, the church argues, the court should have adopted that interpretation.

We agree with the church. We first address the court's holding on ambiguity. We then discuss the court's reasoning that it is "unclear what it means to interpret this language in favor of the insured." *See id.*

## A.    The provisions are ambiguous.

Under Utah law, a contractual provision is ambiguous when it "is capable of more than one reasonable interpretation." *Doctors' Co. v. Drezga*, 218 P.3d 598, 607 (Utah 2009). This means that "the terms used to express the intention of the parties may be understood to have two or more plausible meanings." *Saleh v. Farmers Ins. Exch.*, 133 P.3d 428, 432 (Utah 2006) (citation omitted). A "plausible meaning" must be "more than a conjecture," cannot be a "forced or strained construction," but "may be less than a certainty." *Id.* at 433 (citation omitted). And again, "any ambiguity" in an insurance policy "must be resolved in favor of coverage." *Lopez*, 274 P.3d at 902 (citation omitted).

For this appeal, we assume that the district court's interpretation of the policies—that "a separate occurrence arose every time Mr. Jensen abused

10

separate children at separate times and in separate places"—is plausible. *See LDS*, 817 F. Supp. 3d at 1234-35.

Turning to the church's interpretation of the policies, recall National Union's definition of "occurrence": "an accident, including . . . *repeated* exposure to substantially the same *general* harmful conditions." App. vol. 1, at 92 (emphasis added). The church plausibly reads "general harmful conditions" to include "the dangerous environment allegedly created by" failing to take precautions against Jensen's abuse. Op. Br. at 38. The provision's "deeming clause" adds that "[a]ll such exposure . . . will be deemed to arise out of one Occurrence." *Id.* An insured could reasonably read the deeming clause to consolidate separate victims' exposure to that dangerous environment into one occurrence. So even though the victims were separate children abused at separate times in separate places, the church plausibly reads the policy to count those "repeated exposure[s]" as "one Occurrence." *See* App. vol. 1, at 92.

The church's interpretation fits ACE's policy even better. That policy states that "exposure to substantially the same general harmful conditions" is one occurrence "regardless of the frequency or repetition thereof, or the number of claimants." App. vol. 1, at 277. To the church, this means that there was one occurrence when separate victims were exposed at separate times in separate places to the dangerous environment created by the church's alleged negligence.

11

This is enough to reject the district court's first holding. We need not hold that the church's interpretation is the most reasonable or most plausible interpretation. And we don't. We hold only that it is plausible. And because it is plausible, and the district court's interpretation is also plausible, the provisions are ambiguous under Utah law.

The insurers defend the district court's decision as "properly consider[ing] the prevailing authority from other jurisdictions." ACE Br. at 24. And they assert that the court "correctly found that the relevant caselaw as a whole" supports counting multiple instances of abuse as multiple "occurrences." *Id.* at 26 (citation modified); *see also LDS*, 817 F. Supp. 3d at 1224–31.

To be sure, several courts have grappled with similar provisions to decide whether sexual abuse counts as one "occurrence" or several. But there's no consensus on how to interpret "occurrence." We see at least three approaches.

First, some courts have held that an institution's negligence toward repeated sexual abuse counts as one occurrence. *See, e.g.*, *Washoe County v. Transcon. Ins.*, 878 P.2d 306, 308 (Nev. 1994) (concluding that a county's "negligence in the licensing process and in its attendant duties to investigate and monitor" was one occurrence). And contrary to its position here, ACE itself has argued that "87 actions involving 212 victims" "dating back to the 1940s" could be seen as one "longstanding institutional policy . . . [to] cover up the sexual abuse of minors," because that policy "was the proximate, uninterrupted

and continuing cause of the underlying victims' injuries." *See* Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss the Complaint, at 2, 20, *Century Indem. Co. v. Diocese of Trenton*, No. 3:24-cv-00685 2024 WL 3159936 (D.N.J. Apr. 22, 2024). There, ACE cited several courts that have counted institutional failures, like condoning repeated instances of discrimination or police brutality, as one occurrence. *Id.* at 20 & n.2 (citing, among other cases, *Appalachian Ins. Co. v. Liberty Mut. Ins.*, 676 F.2d 56, 61 (3d Cir. 1982), and *Mead Reinsurance v. Granite State Ins.*, 873 F.2d 1185, 1188 (9th Cir. 1988)).

Second, some courts have held that when an abuser harms different victims at different times, an institution's negligence toward that abuse counts as several occurrences. *See, e.g.*, *Interstate Fire & Cas. Co. v. Archdiocese of Portland in Or.*, 35 F.3d 1325, 1329 (9th Cir. 1994) (stating that similar "occurrence" language unambiguously means one occurrence per instance of abuse of the same victim); *Lee*, 86 F.3d at 104–05 (noting the lack of a factual record but reasoning that separate abuse of separate victims at separate times likely counts as multiple occurrences); *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. of Pittsburgh*, 150 F.3d 526, 528, 535 (5th Cir. 1998) (opinion of Garza, J.) (reasoning that separate abuse of separate victims at different times counts as separate occurrences); *Roman Cath. Diocese of Brooklyn v. Nat'l Union Fire Ins. of Pittsburgh*, 991 N.E.2d 666, 672 (N.Y. 2013) (holding that

13

separate instances of abuse are multiple occurrences under a policy that lacked a "deeming" clause).

Third, some courts have held that definitions of "occurrence" resembling the ones here have more than one plausible interpretation. After finding that, those courts usually choose a reasonable interpretation that favors coverage. *See, e.g.*, *Scott Fetzer Co. v. Zurich Am. Ins.*, 769 F. App'x 322, 327 (6th Cir. 2019) (holding that a similar "occurrence" definition is ambiguous, then adopting the insured's reasonable reading of its underlying conduct as one occurrence); *S.F. v. W. Am. Ins.*, 463 S.E.2d 450, 452 (Va. 1995) (same, but adopting the insured's reasonable reading of its underlying conduct as several occurrences); *but cf. Soc'y of Roman Cath. Church of Diocese of Lafayette & Lake Charles, Inc. v. Interstate Fire & Cas. Co.*, 26 F.3d 1359, 1364–65 (5th Cir. 1994) (same, but citing Louisiana law to find a separate occurrence per victim).

These conflicting approaches reinforce our conclusion that the policies are ambiguous. That's because under Utah law, an insurance-policy provision is more likely to be ambiguous when different jurisdictions have "conflicting interpretations" of it. *See W. Am. Ins. Co. v. AV&S*, 145 F.3d 1224, 1227–29 (10th Cir. 1998). More importantly, the church's interpretation plausibly fits with the language of the two policies before us. Under Utah law, the court's role is to ask if the insured's interpretation is plausible, not to harmonize policy interpretation across jurisdictions. *See Versaw*, 99 P.3d at 799–800. If the

14

insured's interpretation is plausible, we must adopt it—even if it's not the best reading, and even if other jurisdictions read the same provision differently.

Next, we reject ACE and the district court's analogy to a car crash. To them, the church's reading of the policy cast Jensen as "a bad driver whom the Church negligently hired and who injured multiple people in a single crash," while Jensen's repeated assaults were "more analogous to a bad driver . . . negligently allowed back on the road over and over, despite repeated accidents." *LDS*, 817 F. Supp. 3d at 1224.

Through this analogy, ACE suggests that the church's interpretation doesn't fit with a "common sense" understanding of "occurrence." *See* ACE Br. at 36. But Utah law tells us to examine the policy language, not common sense. *See Saleh*, 133 P.3d at 433–34. ACE's policy language deems "continuous or repeated exposure to substantially the same general harmful conditions" to be one "occurrence," "regardless of the frequency or repetition thereof, or the number of claimants." App. vol. 1, at 277. The church's interpretation fits within ACE's definition of "occurrence," and that's what matters.

## B.    *Lee* **doesn't apply here.**

We now turn to the district court's alternative holding on ambiguity. In effect, it held that Utah's rule for interpreting ambiguous provisions in favor of the insured didn't apply. Citing *Lee*, 86 F.3d 101, a clergy-sexual-abuse case applying Rhode Island law, the district court declined "to adopt an interpretation of 'occurrence' that would shift in meaning between insureds

15

who wish to avoid the application of multiple retained limits and insureds who wish to avoid the application of a liability cap."[3] *LDS*, 817 F. Supp. 3d at 1236. The insurers repeat this argument on appeal.

The insurers are wrong. To start, *Lee* chose not to read the policy against its drafter because the case was by then between two insurers, one of which "chose to 'follow form' to [the other's] policy and [was] therefore equally its author." *Lee*, 86 F.3d at 104, 105; *see generally* 2 Couch on Ins. § 22:24 (3d ed. 2025) (explaining that the rule of reading ambiguity in favor of coverage is inapplicable to "disputes between two insurers"). This fits with Utah law, which reads ambiguous provisions in an insured's favor in part because of "the need to afford the insured the protection" it paid for. *See Doctors' Co.*,

---

[3] As an example of this "shift in meaning," consider two scenarios with a retained limit of $100, a maximum payout of $1,000 per occurrence, and three victims with whom the church settles.

In Scenario 1, the church settles for $100 with each victim. If the church's negligence counts as one occurrence per victim, the insurers pay nothing. But if the church's negligence toward all three victims counts as *one* occurrence, then the settlements would add up to $300, of which the insurer would pay $200. In this scenario, the insured wants the abuse to count as one occurrence, while the insurer wants it to count as several. *See, e.g.*, *Scott Fetzer Co.*, 769 F. App'x at 324–25.

In Scenario 2, the church settles for $1,000 with each victim. If the church's negligence counts as one occurrence, the insurer pays only $900 to satisfy the policy ($1,000 minus the $100 retained limit), while the church pays the remaining $2,100. But if the church's negligence counts as one occurrence per victim, the insurer would need to pay $2,700 ($900 for each of the three victims), while the church would pay the remaining $300. *See, e.g.*, *S.F.*, 463 S.E.2d at 452. So in this scenario, the *insurer* wants the abuse to count as one occurrence, while the *insured* wants it to count as several.

218 P.3d at 603 (citation omitted). That need isn't present in disputes between insurers. And unlike *Lee*, this is a case between an insurer and an *insured*.[4]

We also reject the district court's "shift in meaning" reasoning. That reasoning comes from *Lee*, which held that "what it means to construe ["occurrence"] against the author is itself ambiguous" because "[w]inners and losers will change with the circumstances." *See id.* at 104. As in, the district court worried that on Monday, an insured could argue that an insurance policy counts discrete accidents as one "occurrence." *See LDS*, 817 F. Supp. 3d at 1236. And on Tuesday, because of different settlement amounts in a different case, the same insured could argue that the same policy counts discrete accidents as separate "occurrences." *See id.*

This could happen. So what? Under Utah law, the court's job is to ask whether the insurer wrote a policy that can reasonably be interpreted in two ways. If so, then the insurer has invited insureds to play "heads I win tails you lose" with that ambiguous provision. Ambiguous provisions thus carry a high price. To avoid that high price, insurance-policy drafters can clarify those provisions—to the benefit of the insurer, the insured, and the courts.

\*　　\*　　\*

---

[4] In the district court, National Union and the church disputed whether Utah law requires resolving ambiguous provisions in favor of sophisticated insureds, like the church. The court didn't rule on this issue, and it hasn't been raised on appeal.

In sum, we reject the district court's holdings. On remand, the district court should proceed from the understanding that the policies' definitions of occurrence are ambiguous and that the church's interpretation is reasonable.

## II.    We choose not to affirm on alternative grounds.

The insurers argue that even if the church's reading of the policy is reasonable, we should affirm on alternative grounds.

National Union argues that its policy expired before most of Jensen's abuse, so it shouldn't be liable for settlements with those victims. And ACE argues that settlements for injuries across policy periods can't be added together, that bodily injury doesn't include emotional injuries, and that ACE bears no responsibility for the church's defense costs.[5]

"As a general rule, we do not address issues not ruled on by the district court." *Tillman ex rel. Est. of Tillman v. Camelot Music, Inc.*, 408 F.3d 1300, 1307 (10th Cir. 2005). Because the district court never addressed these arguments, we decline to consider them for the first time on appeal.

## CONCLUSION

We reverse the district court's grant of summary judgment to ACE and National Union, and we remand for further proceedings.

---

[5] ACE also argues that we should affirm the district court's entry of summary judgment against the church's bad-faith claim. But the church didn't appeal that ruling.

18